United States Court of Appeals
Fifth Circuit

**F I L E D**

**March 1, 2006**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 00-20915

_____

ROBERT JAMES TENNARD,

                                        Petitioner-Appellant,

versus

DOUGLAS DRETKE, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
CORRECTIONAL INSTITUTIONS DIVISION,

                                        Respondent-Appellee.

--------------------
Appeal from the United States District Court
for the Southern District of Texas, Houston

-------------------

Before SMITH, BENAVIDES, and DENNIS, Circuit Judges.

FORTUNATO P. BENAVIDES, Circuit Judge:

    Petitioner Robert James Tennard appeals the district court's
denial of his habeas corpus petition.  Because the Texas courts
were objectively unreasonable under applicable Supreme Court Eighth
and Fourteenth Amendment jurisprudence in concluding that Tennard's
jury had an adequate vehicle during the capital sentencing phase to
give mitigating effect to relevant evidence of a low intelligence
quotient ("IQ"), we reverse the district court's decision and
remand with instructions to grant habeas relief.

I.

1

A.

The facts of Tennard's heinous crime and the subsequent state criminal trial are set forth in the prior opinions this court, the Supreme Court, and the Texas Court of Criminal Appeals. *See Tennard v. Cockrell*, 524 U.S. 274 (2004); *Tennard v. Cockrell*, 284 F.3d 591 (5th Cir. 2002), *vacated by* 537 U.S. 802 (2002); *Ex parte Tennard*, 960 S.W.2d 57, 58 (Tex. Crim. App. 1997), *cert. denied*, *Tennard v. Texas*, 524 U.S. 956 (1998); *Tennard v. Texas*, 802 S.W.2d 678, 679 (Tex. Crim. App. 1990), *cert. denied*, 501 U.S. 1259 (1991). Tennard met his accomplices Paul Anthony Bogany and Daniel Groom at the Groovey Shack Lounge in Harris County, Texas, on August 15, 1985. At approximately 8:00 p.m., the three men walked to the house of Tennard's neighbors, Larry Neblett and Chester Smith. The five men drank alcoholic beverages and smoked marijuana together for approximately thirty minutes.

Neblett exited the room in which the five were socializing. Tennard followed him; the other three stayed behind. Shortly thereafter, Groom struck Smith several times with a hatchet, as Smith tried to change the record on the turntable. Smith fell to the ground and Groom ran to the house's bedroom where Tennard and Neblett were. Groom opened the door and Neblett, drenched in blood, fell through the doorway. Tennard stood in the bedroom, clutching a bloody knife. Smith and Neblett died of their injuries; Neblett suffered fifteen stab wounds. Tennard, Groom,

and Bogany proceeded to plunder the house, collecting items of value and departing in one of the victim's cars. The three traveled to the home of Fred Stewart and Ruby Montgomery and enlisted Stewart's help in disposing of the stolen items. Tennard himself played a dominant role in the process. He gave Stewart several gasoline credit cards. And it was Stewart's unauthorized use of these credit cards that ultimately led to Tennard's arrest.

B.

On October 17, 1985, Tennard was indicted for Neblett's murder. Following the presentation of evidence, the Texas state jury convicted Tennard of capital murder.

During the penalty phase of the trial, the government introduced evidence of Tennard's prior felony rape conviction, for which he had been on parole for only three and one-half months when he murdered Neblett. Tennard was 16 years old at the time of the rape. His victim testified that she was waiting at a bus stop, when Tennard and two of his friends forced her into a car. Once she was secured in the vehicle, Tennard brandished a foot-and-a-half-long pipe-wrench and warned her, "Move, white bitch, and you're dead." She testified that Tennard and his two friends drove her to an abandoned apartment in a government housing project. Tennard sexually abused, raped, and forcibly sodomized her. After he finished, his friends took turns sexually assaulting her.

The three then transported the victim to another dwelling where Tennard and his friends engaged in recreational drug use and

3

discussed the possibility of using their victim as a prostitute. She asked Tennard if he would allow her to go to the bathroom to take a bath. Tennard asked her if she would run away. She responded, "No, baby. I like you. I wouldn't do that." So he allowed her to go to the bathroom unaccompanied. She promptly escaped through a window. Police arrested Tennard later that day. During the penalty phase of the instant case, Tennard impeached his rape victim's testimony by introducing a prior statement she made from which one could infer that one of Tennard's friends--not Tennard--was in fact the ringleader.

Tennard's counsel called only one witness during the penalty phase in the instant case--Tennard's parole officer. He testified to the existence of a Texas Department of Correction's record from the felony rape conviction indicating that Tennard had an IQ of 67. The IQ test was administered five years before Tennard, at the age of 22, murdered Neblett. No evidence was presented regarding who prepared the report or who administered the exam.

The trial court charged the jury with answering the two Texas "special issues": (1) "Was the conduct of the defendant, Robert James Tennard, that caused the death of the deceased committed deliberately and with the reasonable expectation that the death of the deceased or another would result?" (the "deliberateness special issue"); (2) "Is there a probability that the defendant, Robert James Tennard, would commit criminal acts of violence that would constitute a continuing threat to society?" (the "future

4

dangerousness special issue").[1]  If the jury provided an answer of "no" with regard to either question, the trial court would sentence Tennard to life in prison rather than death.  *See* Tex. Crim. Proc. Code Ann. § 37.071(e) (Vernon 1981).

Defense counsel argued to the jury that it should spare Tennard's life, because, *inter alia*, Tennard's limited cognitive abilities made him less morally culpable:

> Then I called a witness who testified he's Tennard's parole officer.  Uncontroverted evidence that when Robert Tennard was examined, when he got out of the penitentiary, by the officials who determined how to classify him, how to treat him, the same information that was communicated to his parole officer, what to do for him, how to help him when he's out on parole. Information that the prison psychiatrist had, the information that they gave is that Tennard has got a 67 IQ.  The same guy that told this poor unfortunate woman [the rape victim] that was trying to work that day, "Well, if I let you in there, will you leave?"  And he believed her.  This guy with the 67 IQ, and she goes in and, sure enough, she escapes, just like she should have. That is uncontroverted testimony before you, that we have got a man before us that has got an intelligence quotient . . . that is that low.
>
> * * *
>
> Now you're charged with acting as Robert Tennard's peers. You have to judge him as his peers.  That's going to be hard for you to do.  None of you grew up where he grew up.  Only one of you is black and none of you are suffering from a 67 IQ.  So you're going to have to try

---

[1]At the time of the trial, the Texas Code of Criminal Procedure provided for a third special issue to be answered by the jury, if applicable: "whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased."  Tex. Crim. Proc. Code Ann. § 37.071(b)(3) (Vernon 1981).  This inquiry was not germane to Tennard's case.  *See Tennard*, 543 U.S. at 278.

5

to judge this man and decide what his punishment would be as his peers. And I would ask you as you do that, as is your responsibility, you take into consideration the things that you have been informed of by me and by things the prosecutor has told you in judging Robert Tennard .
. . .

* * *

And don't let [the prosecutor] get up here and tell you to put blinders on and just answer the questions in a vacuum. The law allows you to take all the things into consideration that I talked to you about--attitude toward the death penalty, take all these things into consideration, the 67 IQ--in deciding how you answer the those [sic] questions. You have a right to do that under Texas law. Don't let [the prosecutor] tell you you can't just look at the evidence and just answer the questions. You are allowed more latitude than that. Remember, what you do here will be forever lasting one way or the other.
. . .

During rebuttal, the government argued that evidence showing Tennard has a low IQ is irrelevant for determining death-worthiness under the Texas special issues:

But whether he has a low IQ or not is not really the issue. Because the legislature, in asking you to address that question [the future dangerousness special issue], the reasons why he became a danger are not really relevant. The fact that he is a danger, that the evidence shows he's a danger, is the criteria to use in answering that question.

The jury answered both special issues in the affirmative, and the court sentenced Tennard to death.[2]

C.

Tennard filed a direct appeal of his conviction with the Texas

---

[2]The trial court instructed the jury that all jurors must be convinced beyond a reasonable doubt that the proper answer to each question is "yes."

6

Court of Criminal Appeals, asserting constitutional and evidentiary errors during the trial. *See Tennard*, 802 S.W.2d 678. In 1990, the Court of Criminal Appeals denied the appeal. *See id.* at 686. Tennard subsequently sought a state writ of habeas corpus, on the ground that the capital sentencing procedures violated the Eighth and Fourteenth Amendments of the U.S. Constitution. *See Ex parte Tennard*, 960 S.W.2d 57. In 1997, the Texas Court of Criminal Appeals again denied relief. *See id.* at 63. Tennard then sought a federal writ of habeas corpus. *Tennard*, 284 F.3d at 594. He filed a petition in the District Court for the Southern District of Texas. *Id.* The district court denied Tennard's petition and his request for a Certificate of Appealability ("COA"). *Id.* In 2002, we refused to grant Tennard a COA as well. *See id.* at 597. The U.S. Supreme Court granted Tennard's writ of *certiorari*, vacated our ruling, and remanded the case for reconsideration in light of its recent opinion in *Atkins v. Virginia*, 536 U.S. 304 (2002), which prohibits application of the death penalty to the mentally retarded. *See Tennard v. Cockrell*, 537 U.S. 802 (2002); *Tennard v. Cockrell*, 317 F.3d 476, 477 (5th Cir. 2003). Because Tennard never argued that the Eighth Amendment prohibited his execution due to his low IQ (but rather objected to the sentencing procedures), we reinstated our prior opinion denying the COA. *See Tennard*, 317 F.3d at 477. The Supreme Court once again granted *certiorari* and, in 2004, reversed our decision, thereby requiring the issuance of

7

a COA.  *See Tennard*, 524 U.S. at 289.  Thus, we now determine whether the district court erred in not granting Tennard's petition for a writ of habeas corpus.

## II.

To obtain habeas relief upon the grant of a COA, the petitioner must demonstrate that the state court proceeding "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); *see also Martinez v. Dretke*, 404 F.3d 878, 884 (5th Cir.), *cert. denied*, 126 S. Ct. 550 (2005).  "A state-court decision [is] contrary to [the Supreme] Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a [different] result . . . ."  *Williams v. Taylor*, 529 U.S. 362, 406 (2000).  "A state court decision constitutes an unreasonable application of clearly established law if the 'state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case.'"  *McCall v. Dretke*, 390 F.3d 358, 363 (5th Cir. 2004) (quoting *Williams*, 529 U.S. at 407).  "[F]ederal *habeas* courts must deny relief that is contingent upon a rule of law not clearly established at the time the state conviction becomes final."  *Peterson v. Cain*, 302 F.3d 508, 511

8

(5th Cir. 2002).

The habeas petitioner may also receive relief if the state court's "decision . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  However, "a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *see also Patterson v. Dretke*, 370 F.3d 480, 484 (5th Cir.), *cert. denied*, 541 U.S. 1058 (2004).

*III.*

A.

The legal issues in this matter arise from changes made to the Texas capital sentencing procedures in the wake of the Supreme Court's declaration in *Branch v. Texas*, decided with *Furman v. Georgia*, 408 U.S. 238 (1972), that the state system was unconstitutional.  Texas responded by limiting the scope of crimes eligible for the death penalty under Texas law and adopting a uniform sentencing procedure, the special issues, to guide the jury in determining whether the death penalty is warranted.[3]  *See Jurek*

---

[3]The special issues in effect at the time of Tennard's conviction were:
(1)whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;
(2) whether there is a probability that the defendant

9

*v. Texas*, 428 U.S. 262, 268-69 (1976).

The Supreme Court first addressed the special issues' constitutionality in *Jurek v. Texas*. 428 U.S. 262. The three-justice *Jurek* plurality held that, "in order to meet the requirement of the Eighth and Fourteenth Amendments, a capital-sentencing system must allow the sentencing authority to consider mitigating circumstances." *Id.* at 271. The Court acknowledged that the special issues do not explicitly address the admissibility of mitigating evidence. *See id.* at 272. However, it noted that the Texas Court of Criminal Appeals said, in handling *Jurek*, that it would interpret the future dangerous special issue "so as to allow a defendant to bring to the jury's attention whatever mitigating circumstances he may be able to show." *Id.*

---

would commit criminal acts of violence that would constitute a continuing threat to society; and
(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.
Tex. Crim. Proc. Code Ann. § 37.071(b) (Vernon 1981).

This procedure has since been altered. Significantly, for present purposes, the Texas legislature reacted to *Penry v. Lynaugh*, 492 U.S. 302 (1989) *(Penry I)*, discussed *infra*, by amending the code so that the capital jury must answer a final special issue that will override affirmative answers on the others, if the jurors answer the supplemental question "yes": "Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed." *Id.* at § 37.071(e) (amended 1991); *see also* Janet Morrow & Robert Morrow, *In a Narrow Grave: Texas Punishment Law in Capital Murder Cases*, 43 S. Tex. L. Rev. 979, 998-99 (2002).

Specifically, it said that the jury could consider "'prior criminal conduct,'" the defendant's age, whether the defendant committed the present offense "'under duress or under domination of another,'" and "'whether the defendant was under an extreme form of mental or emotional pressure.'" *Id.* at 273 (quoting *Jurek v. Texas*, 522 S.W.2d 934, 940 (Tex. Crim. App. 1975)). All of these mitigating factors are transitory. Once the youthfulness, duress, or pressure pass, as all tend to do, the defendant may be less prone to violence. Thus, weighing these factors' impermanence and their role in influencing the defendant to commit murder, a jury could spare the defendant's life with a "no" response to the future dangerousness special issue.[4] The *Jurek* Court also opined that the Court of Criminal Appeals could construe the third special issue to allow for mitigating evidence consideration as well. *See id.* at 273 n.7.

---

[4]The *Jurek* plurality did not delineate whether Texas procedure merely allowed the jury to simply *consider* the evidence or if it also permitted the jury to *give effect* to its consideration. Clearly, such a distinction does exist, linguistically and practically. In *Jurek*, the Court conflated the two. The plurality opinion only speaks to "bring[ing] to the jury's attention" the mitigating evidence and allowing the jury to "consider whatever evidence of mitigating circumstances the defense can bring before it." *Jurek*, 428 U.S. at 272, 273. In subsequent opinions, the Court's language did acknowledge this distinction. *See, e.g.*, *Penry I*, 492 U.S. at 319; ("The sentencer must also be able to consider and give effect to that evidence in imposing sentence."); *Franklin v. Lynaugh*, 487 U.S. 164, 177-78 (1988) ("[P]etitioner was accorded a full opportunity to have his sentencing jury consider and give effect to any mitigating impulse that petitioner's prison record might have suggested to the jury as they proceeded with their task.").

11

In *Franklin v. Lynaugh*, 487 U.S. 164, the Supreme Court again entertained a challenge to Texas' capital punishment sentencing procedure. The petitioner contended that the special issues did not permit the jury to give sufficient mitigating effect to "evidence of [his] good behavior while in prison" during two separate terms. *Id.* at 168, 172. A plurality of the Court found this argument unpersuasive, noting that "*Jurek v. Texas*, 428 U.S. 262, 96 S. Ct. 2950, 49 L. Ed. 2d 929 (1976), expressly upheld the constitutionality of the manner in which mitigating evidence is considered under the 'Special Issues' submitted to Texas capital juries." *Id.* at 171. It rejected the "petitioner's contention that relevant aspects of his 'character,' as far as they were illuminated by the presentation of evidence concerning petitioner's disciplinary record, encompassed anything more than those matters fully considered by the jury when it was asked to answer the second Special Issue." *Id.* at 178. The *Franklin* plurality also acknowledged the appropriateness of cabining and guiding the jury's consideration of mitigating evidence: "If, as *Jurek* held, it is constitutional for Texas to impose a death sentence on a person whenever a jury answers both Special Issues in the affirmative-- without any other inquiry--then surely Texas must be permitted to direct the jury's consideration of mitigating evidence to those items relevant to this undertaking." *Id.* at 180 n.10.

The Supreme Court in *Penry I*, 492 U.S. 302, pulled back from

12

the *Franklin* plurality's stance that the special issues are facially valid.  Several opinions, issued after *Jurek*, heavily influenced the High Court's approach.  First, in *Teague v. Lane*, 489 U.S. 288 (1989), a plurality of the Court held "that a new rule will not be applied retroactively to defendants on collateral review unless it falls within one of two exceptions."[5]  *Penry I*, 492 U.S. at 329.  Since Penry was a habeas petitioner, the Court was limited to rules dictated by precedent.

The other two cases dealt directly with the constitutionality of capital sentencing procedures.  "In *Lockett v. Ohio*, 438 U.S. 586, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978), a plurality of th[e] Court held that the Eighth and Fourteenth Amendments require that the sentencer 'not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'"[6]  *Id.* at 317 (quoting

---

[5]One exception is a new rule that places some sort of private conduct beyond the state's proscriptive powers; the other is a new procedure that is "implicit in the concept of ordered liberty."  *Teague*, 489 U.S. at 307 (quoting *Palko v. Conn.*, 302 U.S. 319, 325 (1937)) (internal quotation marks omitted).

[6]The *Lockett* plurality stated that the Texas special issues passed constitutional muster in *Jurek* "because three Justices concluded that the Texas Court of Criminal Appeals had broadly interpreted the second question--despite its facial narrowness-- so as to permit the sentencer to consider 'whatever mitigating circumstances' the defendant might be able to show."  *Lockett*, 438 U.S. at 607 (quoting *Jurek*, 428 U.S. at 272).

13

*Lockett*, 438 U.S. at 604) (emphasis in original).  And, "[i]n *Eddings v. Oklahoma*, 455 U.S. 104, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982), a majority of the Court reaffirmed that a sentencer may not be precluded from considering, and may not refuse to consider, any relevant mitigating evidence offered by the defendant as the basis for a sentence less than death."  *Id.* at 318.  These cases, rather than *Jurek*, provided the guiding precedent in *Penry I*.[7]  "Thus, at the time Penry's conviction became final, . . . a State could not, consistent with the Eighth and Fourteenth Amendments, prevent the sentencer from considering and giving effect to evidence relevant to the defendant's background or character or to the circumstances of the offense that mitigate against imposing the death penalty."  *Id.*

---

[7]The Court also recharacterized *Jurek*.  As noted *supra*, *Franklin* described *Jurek* as recognizing the special issues' facial constitutionality.  *See Franklin*, 487 U.S. at 180 n.10. In *Penry I*, the Court argued that the *Jurek* ruling was based "on the assurance that the Texas Court of Criminal Appeals would interpret the question concerning future dangerousness so as to allow the jury to consider whatever mitigating circumstances a defendant may be able to show, including a defendant's prior criminal record, age, and mental or emotional state."  492 U.S. at 316.  Thus, if the *Penry I* jurors were unable to give effect to the mitigating evidence through the deliberateness special issue, the Texas courts were not holding up their end of the bargain.  The *Penry I* majority pointed out that, in *Franklin*, the five Justices who dissented or concurred agreed with this narrow reading of *Jurek*.  *See id.* at 320.  And, additionally, all five understood *Jurek* to permit "a claim that, in a particular case, the jury was unable to fully consider the mitigating evidence introduced by a defendant in answering the special issues."  *Id.* at 321.

Based on this rule, dictated by *Eddings* and *Lockett*, Justice O'Connor, writing for the majority, found the three special issues insufficient to give effect to Penry's mitigating evidence of low IQ (between 50 and 63, indicating mild to moderate retardation) and childhood abuse (*inter alia*, being beaten over the head with a belt). *See id.* at 307-08, 309, 328. She found that the trial court did not construe the deliberateness special issue broadly enough to ensure that "the jury was able to give effect to the mitigating evidence of Penry's mental retardation and history of abuse in answering the first special issue." *Id.* at 323. Furthermore, Penry's mitigating evidence would only have *aggravating* effect under the future dangerousness special issue, as it showed he was likely to commit a violent offense again.[8] *See id.* The Court thus concluded that, "in the absence of instructions informing the jury that it could consider and give effect to the

---

[8]The *Penry I* Court described Penry's mitigating evidence of mental deficiency and childhood abuse as a "two-edged sword," in that "it may diminish his blameworthiness for his crime even as it indicates that there is a probability that he will be dangerous in the future." *Penry I*, 492 U.S. at 324. We are not certain what the practical effect of this metaphor is for courts applying *Penry I*. While the evidence undoubtedly decreased Penry's "blameworthiness" in an abstract sense, under the special issues as administered in *Penry I*, it is unclear whether it had any *actual* mitigating effect. If it did not, it seems that the sword in *Penry I*, for practical purposes, only had one edge. If it did have mitigating effect, the Court may have been indicating that it was troubled by the prospect of a defendant who by arguing for a "no" vote on one special issue increased the chances of a "yes" vote on another. Fortunately, the disposition of the instant case does not demand resolution of this issue.

15

mitigating evidence of Penry's mental retardation and abused background by declining to impose the death penalty, . . . the jury was not provided with a vehicle for expressing its 'reasoned moral response' to that evidence in rendering its sentencing decision."[9] *Id.* at 328. "[T]he jury must be able to consider and give effect to any mitigating evidence relevant to a defendant's background and character or the circumstances of the crime." *Id.*

*Penry I* could certainly be read broadly to eviscerate *Jurek* and *Franklin*, but the Court signaled in *Saffle v. Parks*, 494 U.S. 484 (1990), that its ruling did not supplant *Jurek*:

> The *Penry* Court's conclusion that *Lockett* and *Eddings* dictated the rule sought by *Penry* must be understood in terms of the Court's ruling in *Jurek*, and its application in later cases. We did not view *Lockett* and *Eddings* as creating a rule different from that relied upon in *Jurek*; rather, we indicated that *Lockett* and *Eddings* reaffirmed the reasoning in *Jurek* and confirmed the necessity of its application to Penry's claim.

*Saffle*, 494 U.S. at 492 (citations omitted). This influenced our treatment of *Penry I* in subsequent opinions.

Our general approach to these cases has been to discern whether the capital defendant was able to put forth evidence that was qualitatively like Penry's, and thus outside of the special issues' effective scope:

---

[9]The Court also examined whether the jury could give mitigating effect to Penry's evidence under the third special issue, and found it to be insufficient. *See Penry I*, 492 U.S. at 324-25. Tennard's jury did not receive this instruction as it was inapplicable.

16

> For ten years, this court has [asked] . . . : Was the criminal act "due to the uniquely severe permanent handicaps with which the defendant was burdened through no fault of his own"? *Graham v. Collins*, 950 F.2d 1009, 1029 (5th Cir. 1992) (*en banc*), *aff'd*, 506 U.S 461, 113 S. Ct. 892, 122 L. Ed. 2d 260, (1993). This formulation encompasses four principles found in *Penry I*: voluntariness, permanence, severity, and attribution. Did the defendant acquire his disability voluntarily or involuntarily? Is the disability transient or permanent? Is the disability trivial or severe? Were the criminal acts a consequence of this disability?

*Robertson v. Cockrell*, 325 F.3d 243, 251 (5th Cir. 2003). This "constitutional relevance" test flows from the *Graham* opinion.[10] Judge Garwood, writing for the en banc court in *Graham*, addressed whether the special issues were constitutionally adequate for the jury to consider and give effect to federal habeas petitioner Graham's mitigating evidence of youth, good behavior, and a troubled childhood.

The opinion marches through the relevant precedents, discussed *supra*. *See Graham*, 950 F.2d at 1017-1027. It then questions the constitutional status of the special issues in the wake of *Penry I*: "The . . . difficult question is whether the Texas statute can operate as written in any case where the mitigating evidence,

---

[10]The use of the description "constitutionally relevant" in the Eighth Amendment context originated in the Supreme Court's opinion in *Boyde v. California*. *See* 494 U.S. 370, 380 (1990) ("The claim is that the [jury] instruction is ambiguous and therefore subject to an erroneous interpretation. We think the proper inquiry in such a case is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence.").

though all clearly relevant to support a negative answer to one or more of the issues, nevertheless also has *any* mitigating relevance *whatever beyond* the scope of the special issues." *Id.* at 1026-27 (emphasis in original). One reasonable understanding of *Penry I* is that, in such situations, it renders the special issues constitutionally infirm. However, *Penry I* can also be interpreted as handling a relatively unique situation: "*Penry* can *also* fairly be read as addressing only a situation where some major mitigating thrust of the evidence is substantially beyond the scope of any of the issues." *Id.* at 1027 (emphasis in original). After quoting the language in *Saffle* and cataloguing the many cases in which the Court cited *Jurek* approvingly,[11] *see id.* at 1028, Judge Garwood concluded that "*Penry* represents . . . a set of atypical circumstances of a kind that, quite understandably, neither the Texas Court of Criminal Appeals nor the Supreme Court in *Jurek* had in mind, namely circumstances where the defense's mitigating evidence would have either no substantial relevance or only adverse relevance to the second special issue." *Id.* at 1029.

Judge Garwood's opinion goes on to describe the difference

---

[11]*E.g.*, *Lowenfield v. Phelps*, 484 U.S. 231, 245-46 (1988); *Sumner v. Shuman*, 483 U.S. 66, 74 (1987); *Lockhart v. McCree*, 476 U.S. 162, 183 (1986); *Skipper v. South Carolina*, 476 U.S. 1, 5 (1986); *Pulley v. Harris*, 465 U.S. 37, 48-51 (1984); *California v. Ramos*, 463 U.S. 992, 1000-03 (1983); *Barefoot v. Estelle*, 463 U.S. 880, 896-98 (1983); *Zant v. Stephens*, 462 U.S. 862, 875 n.13 (1983).

between common mitigating evidence (the kind that *Jurek* handled) and this atypical, *Penry*-type evidence:

> Typically, evidence of good character, or of transitory conditions such as youth or being under some particular emotional burden at the time, will tend to indicate that the crime in question is not truly representative of what the defendant's normal behavior is or may become over time, and that the defendant may be rehabilitable so as not to be a continuing threat to society. The core of *Jurek*--which we cannot conclude has been abandoned--is that the mitigating force of this kind of evidence is adequately accounted for by the second special issue. But in *Penry* the Court was faced for the first time with a wholly different type of mitigating evidence. Not evidence of good character, but of bad character; not evidence of potential for rehabilitation, but of its absence; not evidence of a transitory condition, but of a permanent one; but *nonetheless* evidence which was strongly mitigating because these characteristics were due to the uniquely severe permanent handicaps with which the defendant was burdened through no fault of his own, mental retardation, organic brain damage and an abused childhood. There was no way this type of evidence could be given any mitigating force under the second special issue. To recognize that, as *Penry* did, is not necessarily to deny the validity of *Jurek* as it applies to the more typical case.

*Id.* at 1029-30 (emphasis in original). It also noted that Penry's crime was *attributable* to this mitigating evidence. *Id.* at 1031. From this language, we developed the requirements that, to qualify as *Penry* evidence, the condition under which the defendant was laboring must be a uniquely severe, permanent handicap, acquired through no fault of the defendant, and that the defendant's murderous actions must be causally related to the mitigating

19

condition.[12]  This understanding dictated our decision in *Tennard v. Cockrell*.  *See* 284 F.3d 591, 595 (5th Cir. 2002).

The Supreme Court in *Graham v. Collins*, 506 U.S. 461 (1993), affirmed our holding and seemed to endorse the en banc majority's understanding of *Penry I*.  The *Graham* majority characterized the Texas procedure as satisfying the Eighth Amendment's requirements, because it permits the defendant "to place before the jury whatever mitigating evidence he could show, including his age, while focusing the jury's attention upon what that evidence revealed about the defendant's capacity for deliberation and prospects for rehabilitation."  506 U.S. at 472.  *Penry I* did not disturb the special issues' general constitutionality: "We do not read *Penry* as effecting a sea change in this Court's view of the constitutionality of the former Texas death penalty statute; it does *not* broadly suggest the invalidity of the special issues

---

[12]For instance, this analysis, distinguishing *Penry I* from *Jurek,* allowed this court in *Cordova v. Collins* to conclude that, as a matter of law, "voluntary intoxication is not the kind of 'uniquely severe permanent handicap[] with which the defendant was burdened through no fault of his own' that requires a special instruction to ensure that the mitigating effect of such evidence finds expression in the jury's sentencing decision."  953 F.2d 167, 170 (5th Cir. 1992) (quoting *Graham*, 950 F.2d at 1029).  In *Davis v. Scott*, we ruled, based on Judge Garwood's language, that "the evidence must show (1) a 'uniquely severe permanent handicap[] with which the defendant was burdened through no fault of his own,' and (2) that the criminal act was attributable to this severe permanent condition."  51 F.3d 457, 460-61 (5th Cir. 1995) (citations omitted) (quoting *Graham*, 950 F.2d at 1029).

framework."[13] *Id.* at 474 (emphasis in original). The Court concurred with our opinion because, if *Penry I* were extended to evidence like Graham's, which resembles Jurek's, "a wholesale abandonment of *Jurek* and perhaps also of *Franklin v. Lynaugh*" would result. *Id.* at 476.

The Court also noted that Graham's evidence is not the *type* of evidence that *Penry I* discussed. It stated that "Graham's evidence of transient upbringing and otherwise nonviolent character more closely resembles Jurek's evidence of age, employment history, and familial ties than it does Penry's evidence of mental retardation and harsh physical abuse." *Id.* Furthermore, since any mitigating evidence could hold significance beyond the cramped confines of the three special issues, a broad interpretation of *Penry I*, requiring all evidence be given full mitigating effect, would eviscerate *Jurek*--something *Penry I* said it was not doing.[14] *See id.* This echoes Judge Garwood's reasoning.

The Court largely reiterated the logic of its *Graham* ruling in

---

[13]Panels of this circuit have interpreted this "sea change" language as endorsing a narrow reading of *Penry I*. *See, e.g.*, *Vuong v. Scott*, 62 F.3d 673, 679 (5th Cir. 1995); *James v. Collins*, 987 F.2d 1116, 1121 (5th Cir. 1993).

[14]Such a move might also run afoul of Justice Stewart's admonition in *Furman* that "States must limit and channel the discretion of judges and juries to ensure that death sentences are not meted out 'wantonly' or 'freakishly.'" *Graham*, 506 U.S. at 468 (quoting *Furman*, 408 U.S. at 310 (Stewart, J., concurring)).

21

*Johnson v. Texas*, 509 U.S. 350 (1993), which, unlike *Penry I* and *Graham*, was heard on direct appeal.  Johnson's relevant mitigating evidence consisted entirely of his father's testimony about his son's drug use, youthful immaturity, the effect that the recent deaths of Johnson's mother and sister had on Johnson's psyche and religious practices, and Johnson's remorse for the murder.  *See Johnson*, 509 U.S. at 356-57.  The *Johnson* majority read *Lockett* and *Eddings* narrowly:

> "*Lockett* and its progeny stand only for the proposition that a State may not cut off in an absolute manner the presentation of mitigating evidence, either by statute or judicial instruction, or by limiting the inquiries to which it is relevant so severely that the evidence could never be part of the sentencing decision at all." Although *Lockett* and *Eddings* prevent a State from placing relevant mitigating evidence "beyond the effective reach of the sentencer," those cases and others in that decisional line do not bar a State from guiding the sentencer's consideration of mitigating evidence.

*Id.* at 361-62 (citations omitted).  After reviewing *Jurek* and its decisional line, the Court found that the jury was not foreclosed by the special issues from giving effect to Johnson's mitigating evidence.  *See id.* at 368.  His evidence, with its transitory qualities, could be addressed through the second special issue. *See id.*

B.

In *Tennard v. Cockrell*, 284 F.3d 591 (5th Cir. 2002), we applied the "constitutional relevance" screening test, derived from Judge Garwood's *Graham* opinion, to Tennard's evidence of low IQ.

22

Under our jurisprudence, Tennard failed to present to the jury adequate evidence to qualify his alleged handicap as "uniquely severe." *See Tennard*, 284 F.3d at 596. We also found no nexus between Tennard's low IQ and his crime: "Tennard is precluded from establishing a *Penry* claim because he failed to introduce at trial any evidence indicating that the capital murder was in any way attributable to his I.Q. of 67." *Id.* at 597. Thus, even if Tennard's evidence was beyond the effective reach of the jury, he did not establish that it was *Penry*-type evidence. We held that reasonable jurists could not debate this issue and so Tennard failed to make a substantial showing of the denial of a constitutional right.[15] *See id.*

The Supreme Court in *Tennard v. Dretke*, 542 U.S. at 274, reversed our ruling. In doing so, it addressed our erroneous understanding and application of *Penry I* and the other relevant, controlling High Court opinions. Justice O'Connor, writing for the majority, stated: "The Fifth Circuit's test has no foundation in the decisions of this Court. Neither *Penry I* nor its progeny screened mitigating evidence for 'constitutional relevance' before

---

[15]Courts may issue a COA "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Supreme Court has taught that, under this standard, "a petitioner must 'sho[w] that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "adequate to deserve encouragement to proceed further."'" *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

23

considering whether the jury instructions comported with the Eighth

Amendment."[16]  *Tennard*, 542 U.S. at 284.

The majority expressed concern that our screening test operatively precluded effective *Penry* challenges from defendants arguing that the future dangerousness special issue proved an insufficient vehicle for giving mitigating effect to their evidence of good character.[17]   *See id.* at 285-86.   It also

[16]While undoubtedly derived from Supreme Court opinions, our jurisprudence was not logically *dictated* by *Penry I* or the other cases in its decisional line.

[17]Of course, the Court in *Franklin* found that the habeas petitioner's evidence of good character could be given full consideration under the future dangerousness special issue. *See* 487 U.S. at 178.  It is unclear to us what the correct ruling would be in situations generally like Franklin's, but where the character evidence could have some mitigating effect beyond the special issues.  In *Smith v. Texas*, 543 U.S. 37 (2004) (per curiam), the Court indicated that capital sentencing procedures are constitutionally infirm whenever they do "not allow the jury to give '"*full* consideration and *full* effect to mitigating circumstances"' in choosing the defendant's appropriate sentence."  *Id.* at 38 (quoting *Penry v. Johnson*, 532 U.S. 782, 797 (2001)*(Penry II)*) (emphasis in original; *see also Roper v. Simmons*, 543 U.S. 551, __, 125 S. Ct. 1183, 1214 (2005) (O'Connor, J., dissenting) (citing *Tennard* and *Lockett* for the proposition that "the sentencer in a capital case must be permitted to give full effect to all constitutionally relevant mitigating evidence").  This language, which originated in Justice O'Connor's *Johnson v. Texas* dissent, *see* 509 U.S. at 381, may be in tension with *Jurek* and its progeny, particularly *Graham* and *Johnson*.  *See Callins v. Collins*, 510 U.S. 1141, 1156 n.6 (1994) (denying cert.) (Blackmun, J., dissenting) (characterizing the Court's opinion in *Johnson* as "affirming [a] death sentence even though the jurors were not allowed to give full mitigating effect to the defendant's youth under the Texas death penalty statute"); *Graham*, 506 U.S. at 474 (indicating that jurors must be able to give merely "meaningful mitigating effect" to relevant mitigating evidence).
We are unsure whether the Court intended to establish a new

discussed in further detail the two prongs of the test at issue in *Tennard*.  It stated that the "uniquely severe" test is unwarranted: "[T]o say that only those features and circumstances that a panel of federal appellate judges deems to be 'severe' (let alone 'uniquely severe') could have such a tendency is incorrect."  *Id.* at 286.  The Court rejected the nexus test, as well: "Nothing in [*Atkins v. Virginia*, 536 U.S. 304 (2002),] suggested that a mentally retarded individual must establish a nexus between her mental capacity and her crime before the Eighth Amendment prohibition on executing her is triggered."  *Id.* at 287.

The *Tennard* Court stated that, rather than a test for "constitutional relevance," the Court's ruling in *McKoy v. North*

———————————

expansive rule with *Smith*.  We note that the Chief Justice, a dissenter in *Tennard* and *Penry I*, did not file a dissent in *Smith*, even though this language clearly fails to comport with his understanding of *Graham* and *Johnson*.  *See Tennard*,542 U.S. at 291–92 (Rehnquist, C.J., dissenting) ("[A]fter *Johnson* and *Graham*, it is clear that the question is simply whether the jury could give *some* effect to the mitigating evidence through the special issues.").  And the *Smith* Court never indicated it was overruling any precedent or establishing a new rule.  *See In re Kunkle*, 398 F.3d 683, 685 (5th Cir. 2005) (per curiam) ("The express language of the Supreme Court in both *Tennard* and *Smith* makes it clear that neither of these cases announce[s] a new rule . . . .").  However, other panels of this circuit have used the expansive language from *Smith*.  See *Cole v. Dretke*, 418 F.3d 494, 511 (5th Cir. 2005); *Coble v. Dretke*, 417 F.3d 508, 527 (5th Cir. 2005).  Fortunately, we may dispose of the instant case without determining the precise operative effect, if any, of the "full effect" language.  We, thus, leave it to other panels to tidy the High Court's Augean stables.  When, and if, a case arises featuring mitigating evidence, similar in thrust to Graham's and Johnson's, but with potential effect beyond the scope of the special issues, another panel might have such an opportunity.

*Carolina*, 494 U.S. 433 (1990), taught that juries must be permitted to give effect to any mitigating evidence that holds *general* relevance:

> [T]he meaning of relevance is no different in the context of mitigating evidence introduced in a capital sentencing proceeding than in any other context, and thus the general evidentiary standard--any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence--applies.

*Id.* at 2570 (citations and internal quotations omitted). To that end, the Court concluded that "[i]mpaired intellectual functioning has mitigating dimension beyond the impact it has on the individual's ability to act deliberately." *Id.* at 284. It found that "[r]easonable jurists could conclude that the low IQ evidence Tennard presented was relevant mitigating evidence," and that "[r]easonable jurists also could conclude the Texas Court of Criminal Appeals' application of *Penry* to the facts of Tennard's case was unreasonable." *Id.* at 288.

IV.

To resolve Tennard's habeas petition, we must determine whether the Texas courts were objectively unreasonable with regard to Tennard's constitutional claims. The Texas Court of Criminal Appeals first encountered Tennard's *Penry* claim when it entertained his state habeas corpus petition. *See Ex parte Tennard*, 960 S.W.2d 57 (Tex. Crim. App. 1997). It denied Tennard's claim on a number of grounds. First, it distinguished his evidence from Penry's.

26

Specifically, it noted that, unlike Penry's, Tennard's evidence does not prove that Tennard meets the American Association of Mental Retardation's ("AAMR") definition of mental retardation. *See id.* at 61. Second, the Court of Criminal Appeals argued that the special issues did not prevent the jury from giving proper mitigating effect to the low IQ evidence. It pointed out that, unlike Penry, Tennard did not present evidence showing that his "low IQ rendered him unable to appreciate the wrongfulness of his conduct," and, therefore, the future dangerousness special issue would not have only aggravating effect. *Id.* at 62. Additionally, both special issues could have been used to give mitigating effect to Tennard's evidence. "The jury could have used [the low IQ] evidence for a 'no' answer to the first special issue on 'deliberateness.'" *Id.* "Moreover, in considering the circumstances of this offense and applicant's prior felony rape conviction in connection with special issue two [future dangerousness], the jury could have used the low IQ evidence to conclude applicant was a 'follower' instead of a 'leader' since he participated in the commission of both crimes with others." *Id.* Thus, the Court of Criminal Appeals denied Tennard's petition.

We have little difficulty concluding that the Texas court was objectively unreasonable in its application of *Penry I* and the other relevant Supreme Court precedents.

First, the Supreme Court has never held that, in order to be

27

relevant within the context of capital sentencing, evidence of diminished cognitive functioning must permit a finding that the defendant is mentally retarded. Indeed, the Texas Court of Criminal Appeals appears to have committed two errors in its approach to Tennard's IQ evidence. At the outset of the discussion, it declined to find "that evidence of an IQ of 70 or less is sufficient evidence to support a finding of mental retardation." *Id.* at 60. However, the Supreme Court has never indicated that only full-blown mental retardation properly mitigates. *See Tennard*, 542 U.S. at 288 ("Evidence of significantly impaired intellectual functioning is obviously evidence that 'might serve "as a basis for a sentence less than death."'"); *see also Smith v. Texas*, 543 U.S. at 44 (2004) (per curiam) ("[W]e have held that a defendant's IQ score of 79 . . . constitutes relevant mitigation evidence."). Thus, the Court of Criminal Appeals applied an incorrect legal standard by requiring that Tennard show evidence of mental retardation according to the AAMR's standard.

The state court's second error is that it insisted the evidence must be *sufficient* to reach a finding that Tennard was mentally retarded under the AAMR's definition. The Texas Court of Criminal Appeals had the benefit of the High Court's teachings in *McKoy v. North Carolina*, 494 U.S. 433, issued prior to Tennard's conviction becoming final. The Court stated that "[t]he meaning of

28

relevance is no different in the context of mitigating evidence introduced in a capital sentencing proceeding" from what it is in the context of any other phase of a trial. *McKoy*, 494 U.S. at 440. "'[T]o be relevant to an inquiry, [evidence] need not conclusively prove the ultimate fact in issue, but only have "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."'" *Id.* (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 345 (1985)), *cited with approval in Tennard*,543 U.S. at 284; *see also Bigby v. Dretke*, 402 F.3d 551, 567 (5th Cir.), *cert. denied*, 126 S. Ct. 239 (2005).

Penry submitted IQ tests indicating that he is mildly retarded. *See Penry I*, 492 at 307, 308 n.1. Tennard's exam found an IQ of 67--also increasing the likelihood of a finding of mental retardation according to the Supreme Court's *and* the Court of Criminal Appeals' interpretation of the AAMR's standards. See *id.* at 308 n.1 ("Under the AAMR classification system, individuals with IQ scores between 50-55 and 70 have 'mild' retardation."); *Tennard*, 960 S.W.2d at 61 ("The first part of the AAMR test is measured by IQ, and an individual must have an IQ test score of 70 or less to meet the first part of the AAMR definition of mental retardation."). It is unclear to us why the Court of Criminal Appeals agreed that Penry's IQ tests were relevant evidence but argued that Tennard's exam was not. A test showing low IQ, even if

it does not establish mental retardation, unquestionably has the tendency to make more likely such a finding. It is thus relevant for this purpose. A conclusion to the contrary is objectively unreasonable.

Along these lines, we think it is prudent to note that, in general, the Supreme Court has *not* stated that evidence like Penry's must be as strong as his was. Indeed, when *Penry I* is read in conjunction with *McKoy*'s expansive relevance standard, it becomes clear that any evidence similar in mitigating thrust to Penry's, yet less conclusive, would still be relevant. Thus, it is beyond peradventure that a defendant's diminished intellectual capacity constitutes a relevant consideration when determining whether he has the sufficient moral culpability to warrant the death penalty; and it is likewise patent that low IQ scores are relevant to that inquiry.

Second, the Texas Court of Criminal Appeals' discussion of whether the jury could have given Tennard's mitigating evidence aggravating effect under the special issues was unnecessary. The key inquiry, as discussed *supra*, is whether the jury could give sufficient *mitigating* effect to Tennard's evidence. The court must determine whether the special issues were sufficient for mitigating purposes. Unless they were sufficient, there is no reason to investigate whether they also had some aggravating effect. And, as noted in footnote 8 *supra*, we will not engage in a hypothetical

30

discussion regarding the proper disposition of a case in which the special issues could give sufficient mitigating effect but also could give aggravating effect.

Third, the deliberateness special issue is clearly insufficient. The *Penry I* Court held that "evidence of mental retardation and childhood abuse has relevance to . . . moral culpability beyond the scope of the special issues." 492 U.S. at 322. However, as noted in § III(A) *supra*, it left open the possibility that evidence of diminished mental capacity could be given sufficient mitigating effect through the deliberateness special issue, if the "jury instructions defin[ed] 'deliberately' in a way that . . . clearly direct[ed] the jury to consider fully [the defendant's] mitigating evidence as it bears on his personal culpability." *Id.* at 323. We find no evidence in the record, nor has the State brought to our attention any evidence, that the trial court ensured the jury had such an expansive understanding of "deliberately."

Finally, as in *Penry I*, the future dangerousness special issue could only be used to give aggravating effect, if any. *See id.* at 323-24. Mental capacity, generally a static trait, usually does not indicate that a defendant is less likely to perform a particular act in the future. Like nearly all permanent physiological features existing at the time of the crime, it cannot be given mitigating effect through the future dangerousness special

31

issue.

Furthermore, we remain unpersuaded by the argument that the jury could have viewed Tennard as a follower rather than a leader because of his 67 IQ, and, through that inference, have given mitigating effect to Tennard's IQ by determining that there was reasonable doubt whether he would be a future danger once incarcerated. Any convicted murderer's future dangerousness can be limited by the terms of his confinement. Yet, neither the Court of Criminal Appeals nor the State has identified evidence in the record showing that Tennard's terms of incarceration constituted a central inquiry of the punishment phase. Indeed, it strains credulity to argue that a "reasoned moral response" to Tennard's mitigating evidence, or any other defendant's for that matter, could turn on the nature of the particular Texas prison designated to hold him. (Theoretically, as the State would have it, it could improve its chances on the future dangerousness special issue by putting capital convicts in lower security prisons.) In any event, a normal prison setting would have Tennard mingling with dangerous characters.

In sum, we note that the proper legal analysis in such a case is for the court to answer two questions: (1) whether the defendant's evidence held relevance to the jury's capital deliberations; and if so, (2) whether, the jury was able to give constitutionally-sufficient mitigating effect to that evidence. As the foregoing discussion makes abundantly clear, both special

issues constituted insufficient vehicles for the jury to give mitigating effect to Tennard's relevant evidence of low IQ. The Texas courts were objectively unreasonable in concluding otherwise.

## V.

We find that the state court failed to ensure that the jury was able to give sufficient mitigating effect to Tennard's evidence of diminished cognitive capacity, in violation of the Eighth and Fourteenth Amendments. We REVERSE the district court's denial of Tennard's petition for a writ of habeas corpus and REMAND with instructions to grant relief consistent with this opinion.

DENNIS, CIRCUIT JUDGE, CONCURRING IN THE JUDGMENT.

I respectfully concur in the judgment only.

Although I agree with the result reached by the majority, I do not think that the majority opinion follows completely the clearly established Federal law, as determined by the Supreme Court's decisions.

First, I agree with substantially all of the analysis in Part IV of the majority opinion and its conclusion that the Texas courts were objectively unreasonable in denying Tennard habeas relief for the reasons they assigned.

Second, my major disagreement with the majority opinion is that it does not engage in further analysis to determine whether, under the Boyde test, the special issue instruction actually caused an Eighth Amendment violation and, if so, whether the error was harmless under the Brecht test. See Penry v. Johnson, 532 U.S. 782, 800 (2001)(applying the Boyde test); Johnson v. Texas, 509 U.S. 350, (1993)(adopting and applying the Boyde test); Calderon v. Coleman, 525 U.S. 141 (1998)(holding that a federal court must apply both the Boyde test and the Brecht harmless error test before granting habeas corpus relief in death penalty case based on state trial court's erroneous sentencing jury instruction). See also Brecht v. Abrahamson, 507 U.S. 619 (1993); O'Neal v.

34

<u>McAnnich</u>, 513 U.S. 432 (1995); <u>Nelson v. Dretke</u>, No. 02-11096 (5th Cir. 2006)(Dennis, J., concurring in the judgment.)

Third, it might have been consistent with the Supreme Court's cases for the majority to remand with instructions to apply the <u>Boyde</u> and <u>Brecht</u> tests before granting habeas relief, but that does not appear to be the majority's intention. Applying those tests would appear to be our job in any event.

Finally, based on my understanding of the record gained within the time allotted to me, I believe that the majority has reached the same result that a proper application of those tests would reach.