United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 13, 2006**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 03-11097
_____

FERNANDO GARCIA,

Petitioner - Appellant,

versus

NATHANIEL QUARTERMAN, Director,
Texas Department of Criminal Justice,
Correctional Institutions Division,

Respondent - Appellee.

_____

Appeal from the United States District Court
For the Northern District of Texas

_____

Before JONES, Chief Judge, and BENAVIDES and CLEMENT, Circuit
Judges.

EDITH H. JONES, Chief Judge:

This appeal raises questions concerning whether a
petitioner is entitled to a new sentencing hearing for capital
murder based on the Supreme Court's <u>Penry</u> line of cases,[1] whose
purpose is to afford effective jury consideration of evidence
mitigating a defendant's moral culpability. The district court
granted COA on this sole issue, after rejecting the others

---

[1] <u>Penry v. Lynaugh</u> (<u>Penry I</u>), 492 U.S. 302, 109 S. Ct. 2934 (1989);
<u>Penry v. Johnson</u> (<u>Penry II</u>), 532 U.S. 782, 121 S. Ct. 1910 (2001); <u>Tennard v.
Dretke</u>, 542 U.S. 274, 124 S. Ct. 2562 (2004); <u>see also</u> <u>Smith v. Cockrell</u>, 311
F.3d 661 (2002).

petitioner raised.  After careful review, we conclude that Garcia has failed to meet the standards governing habeas relief under AEDPA.

## I.  Background

Around 2:00 a.m. on Sunday, August 30, 1987, Debbie Rodriguez ("Rodriguez") returned from an evening out with friends to discover her three-year old daughter, Veronica, missing.[2]  After Ms. Rodriguez and her fiancee, Martin Barbosa ("Barbosa"),[3] could not find the young girl inside the house, they went to the garage apartment behind the house and asked Fernando Garcia ("Garcia"), who was renting the apartment from Barbosa, whether he had seen Veronica.  Garcia replied that he had not seen the girl and offered to help search for her.  As the three left the area to move back toward the house, Garcia padlocked the apartment behind them. Ultimately, the police were called.

Officer Patrick Burke of the Dallas Police Department was dispatched to the residence around 11:20 a.m. to investigate Veronica's disappearance.  When Officer Burke arrived, he spoke to Rodriguez and Barbosa.  He saw Garcia standing on the porch of the residence with two other men and, shortly thereafter, noticed

---

[2]     This account of the facts is derived primarily from the decision of the Texas Court of Criminal Appeals, <u>Garcia v. State</u>, 887 S.W.2d 846 (Tex. Crim. App. 1994).

[3]     Rodriguez and her two children lived with Barbosa at the time of the crime.  Barbosa's parents actually owned the house, but there was no question that Barbosa had lived there his entire life and exercised present control of the property at the relevant time.

Garcia walk off in an easterly direction. Burke conducted a walk-through search of the house and then went to a nearby store to call his superiors. Because the case involved a child under ten years of age, the department would assign an officer to the case until Veronica was found.

Sometime between 1:30 and 2:00 p.m., Royce Dickey, a youth investigator, arrived at the scene. By the time Dickey arrived, Officer Burke had conducted a thorough search of the house and canvassed the neighborhood, but still had not found the missing child. After discussing the status of the investigation, the officers expressed a need to look in the garage behind the house to determine whether Veronica might have entered the structure and hurt herself. Barbosa explained to the officers that he owned both the house and the garage, and that he had an agreement with Garcia that he could enter the garage whenever he wanted because he kept some of his own property there. Barbosa then consented to the officers' search of the garage. However, when he went to unlock the garage door, Barbosa discovered that his key did not fit the padlock Garcia had placed on it earlier that morning. Barbosa then broke the door open. The officers conducted a cursory search of the garage. After this initial search, the officers and Barbosa found nothing, so they exited the garage and continued the search elsewhere.

The next morning, Monday, August 31, Investigator Dickey returned to the residence and asked Barbosa if he could again

3

search the garage.  Barbosa again consented.  The garage had remained open since the previous day when Barbosa had broken the lock.  Garcia had not been seen since the previous day, when he had supposedly promised Barbosa and Rodriguez to aid in the search.  When Investigator Dickey opened the garage door to initiate a second search, he immediately detected the odor of a dead body.  Upon further investigation, Dickey found the body of young Veronica wrapped in a blanket under Garcia's bed next to a wall of the garage.  She had been brutally sexually assaulted, bitten twelve times, severely beaten with blunt force to the head, and strangled.

Garcia was arrested and charged with capital murder.  A Texas jury convicted him and recommended a sentence of death on December 8, 1989.  The state trial court imposed this sentence pursuant to Texas law.  After exhausting his state court remedies,[4] Garcia filed the instant petition for habeas corpus, which the district court denied.  The district court granted a COA on Garcia's <u>Penry</u> claim.

## II.  Discussion

### A.    Standard of Review

---

[4]      In the Texas Court of Criminal Appeals, Garcia argued, inter alia, that the Texas death penalty jury instructions were inadequate to afford him a meaningful opportunity to give effect to his proffered mitigating evidence. <u>Garcia v. Texas</u>, 887 S.W.2d at 860-61.  The Texas Court of Criminal Appeals upheld his conviction in light of a supplemental jury instruction similar to that given and rejected by the Supreme Court in <u>Penry II</u>, 532 U.S. at 802-04, 121 S. Ct. at 1923-24.

On state habeas review, Garcia argued instead that the supplemental instruction is constitutionally infirm, a contention rejected on grounds of procedural bar and then-binding precedent.  <u>Penry II</u> later vindicated Garcia's contention.

4

The district court granted Garcia a COA on a single issue: whether the trial court violated Garcia's Eighth and Fourteenth Amendment rights by charging the jury with a "nullification" instruction which failed to give effect to his mitigating evidence. As this court has recently stated, to obtain relief Garcia must demonstrate: (1) that his mitigating evidence had relevance beyond the special issues, and (2) that his mitigating evidence was beyond the reach of the jury. See Bigby v. Dretke, 402 F.3d 551, 564-65 (5th Cir. 2005)(reformulating this circuit's Penry I test in light of Tennard v. Dretke, 542 U.S. 274, 124 S. Ct. 2562 (2004)).

As Garcia filed his petition for federal habeas relief after April 24, 1996, the Antiterrorism and Effective Death Penalty Act ("AEDPA") governs this appeal. Under AEDPA,

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim - (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States . . . .

28 U.S.C. § 2254(d). The Supreme Court has explained that a state court decision is "contrary to" federal law where the state court applies a rule that "contradicts the governing law set forth [in Supreme Court precedent];" a state court decision will also be contrary to federal law where, confronting facts that are "materially indistinguishable" from those in controlling Supreme

5

Court precedent, the state court nevertheless reaches an opposite result. Williams v. Taylor, 529 U.S. 362, 405-06, 120 S. Ct. 1495, 1519-20 (2000). A state court is said to have made an "unreasonable application" of federal law where it identifies "the correct governing legal principle from [the Supreme Court] but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413, 120 S. Ct. at 1523.

However, the fact that a habeas court would have reached a different conclusion than did the state court is insufficient to merit habeas relief. Woodford v. Visciotti, 537 U.S. 19, 27, 123 S. Ct. 357, 361 (2002). The Court in Williams was careful to note that "an unreasonable application of federal law is different from an incorrect application of federal law," and as such, the state court's application of federal law must be "objectively unreasonable," as opposed to merely incorrect, for habeas relief to be granted. Williams, 529 U.S. at 409-10, 120 S. Ct. at 1521-22 (emphasis in original); see also Penry v. Johnson (Penry II), 532 U.S. 782, 793, 121 S. Ct. 1910, 1919 (2001). Notwithstanding erroneous reasoning of state courts, we review the reasonableness of their ultimate decision. Neal v. Puckett, 286 F.3d 230, 236 (5th Cir. 2002)(en banc), cert. denied, 537 U.S. 1104, 123 S. Ct. 963 (2003).

**B. Amenability of Garcia's Mitigating Evidence to Jury Consideration**

6

The issue Garcia poses is whether his sentencing violated the Supreme Court's <u>Penry</u> line of cases, which have focused on the inability of the former Texas death penalty issues to allow the jury adequately to consider and give effect to certain mitigation evidence at sentencing. Garcia's evidence may be divided into several categories: (a) childhood sexual abuse and bizarre upbringing, (b) pedophilic condition, and (c) drug and alcohol abuse. To put this evidence in perspective, the State's evidence, as well as Garcia's response to the State's case, is relevant.

During the punishment phase, the State focused on the facts of the grisly crime and Garcia's criminal history. First, the State put forward evidence relating to Garcia's previous conviction for sexual abuse of a child, which he committed on May 5, 1981. The victim was Diana Estrada, the five-year old daughter of a woman Garcia was living with at the time, Rose Maria Estrada. One afternoon, Diana's brother asked a neighbor, Estella Rangel, to come by Garcia's apartment to check on the young girl. Rangel soon noticed that little Diana had "a lump as big as an egg . . . between her private part and her rectum." 20 RR 2734. When Garcia arrived home and realized what was happening, he threatened Rangel. Rangel notified child welfare. Thereafter, whenever Garcia would see Rangel, he would call her a snitch.

Caseworkers from the Texas Department of Human Services ("DHS") investigated the case. After a full investigation, DHS concluded that Garcia had fondled Diana and forced her to perform

7

oral sodomy on him. Additionally, Garcia physically abused Diana, her mother, and her then-eight-year old brother, Roland Esquivel.[5] When questioned during the investigation, Garcia denied any sexual or physical abuse, even after Diana confirmed the allegations. Garcia characterized the allegations as "a big joke" and "ludicrous." Garcia invoked a religious transformation to bolster his denial: He explained to DHS personnel that he was a born-again Christian. While continuing to assert his innocence, Garcia ultimately agreed to leave the home. However, follow-up visits by DHS indicated that he was still living in the apartment, and Garcia proved evasive when questioned about the exact whereabouts of his new residence.

Against the recommendation of the probation officer, Garcia was originally sentenced to probation for these crimes beginning April 16, 1982. The probation officer's notes and pre-sentence report are prescient. During his interview, Garcia admitted engaging in the lewd acts, but claimed that "he was drunk . . . and did not realize what he was doing." 21 RR 2777. Probation was not recommended because the offense was heinous, Garcia (apparently convinced his voluntary intoxication negated his acts) continued to deny any wrongdoing, and his "prognosis for rehabilitation is extremely guarded to poor." Id. at 2780.

---

[5] The State introduced this evidence through the testimony of Esther Diaz and Mel Villareal of the DHS, as well as through the testimony of the individuals involved, Diana Estrada, Rosa Marie Estrada, and Roland Esquivel.

On March 7, 1983, Garcia was paroled. Less than two months later, Garcia was charged with another sexual offense. In the early morning hours of April 28, Garcia broke into the apartment of George Merenue. Merenue's girlfriend, who was asleep, was awakened by someone pulling at her shorts and fondling her. Garcia tried to push her onto her back, but ran away when she fully awoke. For these acts, Garcia was charged with the offense of burglary of a habitation with the intent to commit sexual assault.[6] He was sentenced to ten years in prison, then paroled after serving only three years. He absconded from the halfway house to which he had been assigned.[7] Within a year, Garcia committed the horrific crime underlying the instant case.

In addition to his prior crimes, the State introduced the testimony of Dr. Betty Schroeder. She had evaluated Garcia in 1981 at the request of the Bexar County Probation Office. Garcia initially denied all of the child abuse charges and claimed the DHS investigators "had brainwashed the child into making various accusations, . . . had actually coached the child into saying that he had sexually abused her." 21 RR 2770. When she asked Garcia about his background, he indicated that he had been adopted at

---

[6] The State reduced the charge to simple burglary in exchange for Garcia's guilty plea. Garcia's parole for the conviction for sexual abuse of a child was revoked on these grounds.

[7] Garcia had committed numerous other violations of the rules of his parole. Garcia failed to submit monthly reports in April, May, July, and August 1987; he further failed to report public intoxication offenses committed March 8, 1987, and July 17, 1987.

birth and never really knew his natural father. Additionally, Garcia told Dr. Schroeder that he had dropped out of high school in the tenth grade. Schroeder testified that Garcia's "academic abilities were somewhat diminished" but confirmed that he had above normal intelligence and an IQ of 110. Garcia told Schroeder that he had smoked marijuana and sniffed spray paint in the past, but he denied having used either for six months before November 1981. Schroeder testified that Garcia's prior drug use "strongly suggested some addictive propensities." Id. at 2787.

Dr. Schroeder further testified that Garcia was a pedophile. She defined "pedophile" as "an individual who resolves his sexual excitation, his urges for sex mainly through the use of small children, fondling to actual sexual intercourse." 21 RR 2792. Schroeder characterized Garcia's likelihood for rehabilitation as:

> extremely guarded to poor. . . . Individuals who are pedophiles, in fact, any kind of a psychiatric/ psychological pathology that emerges from the basic human primary drives such as the drive to eat, drink, have sex, . . . are very, very resistant to change. Even the best of psychotherapists, behaviorists, all the range of individuals find it very difficult to penetrate and aid the individual dealing with this kind of pathology.

21 RR 2791. Dr. Schroeder added that even within the confines of prison, secreted away from children, Garcia would express his pedophilic urges through "fighting, viciousness, anger, depression." Id. at 2805. According to Dr. Schroeder, pedophiles

10

tend to "grow more violent, more heinous as time goes on." Id. at 2792.

It is critical to focus on the facts, arguments, and mitigation theory Garcia actually made to the jury before we address his new arguments in federal court. Garcia's mitigation effort began with the cross-examination of Dr. Schroeder. On cross, she testified that Garcia "did not have the usual nurturing [from his parents] that one would hope that a young child would have and did not have the kind of encouragement toward formal education." 21 RR 2794. She "hypothesized" this aspect of Garcia's upbringing based on her experience that "[o]ften times individuals such as this have also been sexually abused as children or had a great deal of abnormality in that area in their rearing." Id. at 2795. Concerning his progression in school, she conceded that Garcia most likely reached the tenth grade only because of social promotion. Defense counsel also elicited testimony amplifying Garcia's substance abuse, as well as Schroeder's opinion that she had observed erratic and psychotic behavior in teenagers who abused drugs or alcohol. Schroeder also testified that she was more optimistic that a substance-abusing pedophile could be rehabilitated than a pedophile who acts out without being intoxicated because it is possible that once the substance abuse is controlled, the pedophile may not act on his urges. Finally, Dr. Schroeder opined that in light of Garcia's past behavior in

11

prison, he would likely conform to the prison environment and would not present a future danger to prison society.

At the beginning of its penalty phase case-in-chief, the defense recalled Estella Rangel. She testified that she first knew Garcia when he began living with Rosa Estrada. Rangel described seeing Garcia cross-dressing on several occasions in 1979; when he dressed in this manner, Garcia would get into a waiting car where he and the driver (also a man) would kiss. Rangel further testified that she had seen Garcia sniffing paint more than once. Rangel stated that she had seen Garcia sniff paint on at least one occasion immediately before he abused Rosa's daughter. Rangel also cited Garcia's paint-sniffing habit as one of the reasons she was afraid of intervening in his abuse of Diane Estrada, which Rangel had witnessed on several occasions.

Garcia also called Dr. Robert Powitzky, a clinical psychologist specializing in sexual abuse. Like Dr. Schroeder, Dr. Powitzky diagnosed Garcia as a pedophile. However, Dr. Powitzky had a much lengthier, and in fact much different, account of Garcia's family history. His most pertinent testimony is as follows:

> [Garcia] was abandoned by his mother to be adopted by his grandmother. They . . . didn't really abuse him, but pretty well neglected him and pretty well ignored him and also exposed him to some witchcraft and other kinds of bizarre . . . experiences.
>
> When his mother would come to visit him, she would take him away. As far back as he could remember, on occasion she would come back and would get herself and

12

him and her boyfriend intoxicated, and they would all have sex together. First it started with him just being in the bed while they were having sex, and graduated to where they all were sexual together.

And he was forced to perform oral sex at the age of five on his older brother's friend, forced by his older brother at the age of six to perform oral sex. Abused . . . at the age of eight by a 14 year old cousin, a female cousin, who had him perform oral sex on her. Third grade was taken for a few weekends by a nun that ostensibly convinced the grandmother that she wanted to help him with confirmation class. And . . . she sexually abused him for a couple of weekends.

Dr. Powitzky conceded that he could not verify any of this information. However, he testified that male victims of sexual abuse tend to respond by acting out, reclaiming a sense of power after the "total helplessness of being sexually abused by someone . . . trusted and loved as a child." Id. at 2867. Feelings of rage and confusion as to sexual identity are also common in child sex abuse victims.

Dr. Powitzky then testified that Garcia would be a danger to free society because he would again resort to substance abuse and engage in further child abuse. However, Powitzky also asserted that Garcia would not be a danger to prison society. Garcia's prior positive disciplinary record in prison, coupled with the sobriety required of prisoners, would result in Garcia's being "much, much less of a danger to anybody." Moreover, Dr. Powitzky asserted that, in his experience, pedophiles tend to be passive, well-behaved inmates, and that, if anything, Garcia himself would be the target of abuse while incarcerated. When asked if Garcia would be likely to abuse "a fresh faced 18 year old boy that looks

13

like he's about 10" if such an inmate were placed in a cell with him, Dr. Powitzky said no, contending that Garcia's preferred victims were young girls. This was Garcia's case for mitigation.[8] Not a single family member or anyone else took the stand to plead for his life.

As previously noted, several types of actual or alleged mitigating evidence are deducible from the trial record. Garcia focuses in this court on the argument that his pedophilia should be treated as mitigating, and in a footnote he "by no means concedes" that his history of childhood physical and sexual abuse, neglect and bizarre upbringing could adequately be considered by the jury under the Texas special issues.[9]

Although evidence that a defendant was a victim of childhood abuse may constitute mitigating evidence, it was not so used here. At trial and before this court, Garcia's child abuse evidence and argument have been entirely bound up in his contention that pedophilia should be treated as a "mitigating circumstance."

---

[8] Absent from Garcia's case is any evidence of organic brain damage, mental retardation, or diminished mental capacity. Garcia's expert, Dr. Powitzky, admitted that he had found no evidence of organic brain disease, brain syndrome, mental illness or psychosis beyond "mild depression" and Garcia's "personality disorder," pedophilia. 21 RR 2875.

[9] Elsewhere, Garcia preserved claims that his substance abuse and good character during incarceration are mitigating. Case law concludes, however, that contrary to Garcia's view, these two types of evidence may be fully accounted for under the Texas sentencing scheme. See Franklin v. Lynaugh, 487 U.S. 164, 177-79, 108 S. Ct. 2320, 2329-30 (1988) (evidence of good character during incarceration encompassed by Texas sentencing scheme); Brewer v. Dretke, __ F.3d __ , No. 04-70034, 2006 WL 477142 (5th Cir. Mar. 1,2006)(evidence pertaining to substance abuse encompassed by Texas sentencing scheme); Harris v. Cockrell, 313 F.3d 238, 242 (5th Cir. 2002)(same), cert. denied, 540 U.S. 1218, 124 S. Ct. 1503 (2004).

14

We disagree, for two reasons.  First, defense counsel neither presented evidence of Garcia's child abuse for its mitigating effect nor sought sympathy at trial based on Garcia's upbringing. Second, being a pedophile is inherently not mitigating of moral culpability.

With respect to the alleged independent mitigating effect of Garcia's childhood sexual abuse, this court can only review the case that his counsel presented to the jury at trial, not the case as Garcia recharacterizes it nearly twenty years later.  At trial, Garcia's own expert testified that he is an irremediable pedophile and, as such, a clear future danger in free society.  Faced with that reality as well as Garcia's criminal record of pedophilia, the defense counsel sensibly urged the jury <u>not</u> to give Garcia sympathy because of his background:

> I ask for no sympathy for Fernando Garcia.  Fernando lost all right to our sympathy when he went from being a victim to a predator.  When Fernando crossed that line, I don't know.  It's nowhere in the evidence.  Two psychologists can't tell you, but he crossed that line. We unfortunately, as lawyers, cannot bring you evidence as to when that line was crossed.

These statements effectively tell the jury not to give any independent mitigating effect to evidence of Garcia's childhood abuse and neglect.  The evidence of his background is presented to the jury only as an explanation for his adult pedophilia.  Counsel essentially argued that Garcia's childhood abuse led to his pedophilia, which in turn precipitated his assault, rape, and murder of Veronica Rodriguez to such an extent that his act was not

15

sufficiently "deliberate" to warrant the death penalty. The defense strategy was to focus on expert testimony that pedophiles do not act with the requisite deliberateness and pose no danger to prison society.

While the Supreme Court has made clear that jurors must not be denied, by any acts of the State — in the death penalty laws or in their implementation through jury instructions — the ability to give effect to mitigating evidence, the Court's rulings do not affect a defendant's trial strategy. No question of constitutional error by the State is raised where, as here, Garcia's evidence of childhood abuse is taken on the terms in which his counsel offered it — as an explanation, but not in extenuation of his crimes. Contrary to the explanation offered by the dissent, the defense counsel's characterization of Garcia as a "predator" and specific request for "no sympathy" do not invite the jury to apportion moral responsibility to persons other than the defendant. Rather, with these statements, defense counsel did just what Garcia contends the special issues do — removed the abuse evidence from the scope of the jury's mitigation considerations.

It may be argued that counsel's above-quoted statements are a mere "rhetorical flourish," part of a peroration culminating in his urging the jury to spare Garcia's life as an act of justice,

not sympathy.[10]   As such, it would be contended, the statements should not constrain Garcia's argument to this court.  We disagree. It is elemental to orderly legal procedure that an appellate court review the case as presented in the trial court.  The record is clear, and the above-quoted references use Garcia's childhood problems only to explain his transformation into a "predator."[11] No doubt counsel chose not to seek mitigation from the evidence of Garcia's childhood because a jury would inevitably draw comparisons with what Garcia had inflicted on other children.  As a result, we reject the contention, offered by the dissent, that the reason for the defense counsel's trial strategy was the constraint imposed by the Texas special issues.  At the time the case was argued, Garcia had the benefit of a nullification instruction.  Even though this type of instruction was later found to be unconstitutional, it

---

[10]     Garcia's counsel went on with this theme very briefly:

We cannot bring you Fernando's father to tell you that my only fatherly act began at conception and ended at conception.  We cannot bring you his mother whose only motherly love was ended at birth.

What do we have? What is the sum total we can bring you about this man? We can bring you two pathetically short records from San Antonio, the sum total of Fernando's academic achievements. We can bring you some records from the Texas Department of Corrections. We can bring you medical records from Maine regarding a suicide attempt.  We do not have the luxury of having any exhibits showing when Fernando was victimized.  When did the neglect, the abuse, the indifference, the poverty and the hate turn Fernando Garcia from a victim to a predator?  Only you can answer that in your verdict.

21 RR 2920-21.

[11]     For that matter, Dr. Powitzky's testimony about Garcia's sexual abuse is (a) based solely on Garcia's history as related to the doctor and (b) the only evidence that Garcia was sexually abused as a child.  There is no corroboration from family members or friends in the record.

17

still provided the defense counsel with a reason to argue mitigation beyond the special issues.

The second error in Garcia's argument is the suggestion that pedophilia may be considered "mitigating" of a defendant's moral culpability. No case has so held. While it may be true that Garcia's condition arose in part from his abnormal childhood, and that the condition is both permanent and involuntary, pedophilia is unlike any other personal characteristic that courts have held to be potentially mitigating. Other personal characteristics, e.g., mental illness, retardation, addiction, or certain personality disorders, may suggest that a defendant is himself arguably both a victim and not fully morally responsible for his actions. Such characteristics have no intrinsic negative component; they may limit a person's potential without necessarily causing harm to society. Pedophilia of the type exhibited by Garcia, however, is manifest only in his victimization of others for his personal, perverted gratification. See, e.g., Kansas v. Hendricks, 521 U.S. 346, 375-77, 117 S. Ct. 2072, 2080, 2088-89 (1997)(Breyer, J., dissenting) (acknowledging pedophilia as a serious mental disorder or abnormality that can render a person dangerous to others). There is no sense in which reasonable people could view Garcia's pedophilia as morally mitigating of guilt, any more than reasonable people would find a defendant's uncontrollable compulsion to commit incest or eat human flesh "mitigating." Garcia's argument, in

18

short, represents a novel and illogical extension of the Supreme Court's <u>Penry</u> cases, which we reject.[12]

### III. Conclusion

Our principal conclusions are that, on the record, Garcia cannot seek mitigating treatment for his childhood abuse because he did not do so before the jury, and he cannot advocate that his pedophilia, as represented in his criminal record and expert testimony, was in any way mitigating.[13] His other forms of mitigating evidence were clearly cognizable by the jury in the context of the special punishment issues. We respectfully disagree with the dissent's position that any evidence of childhood abuse must be considered under <u>Penry</u> regardless of the context in which it was offered at trial. We are presented here with a situation in which the defense counsel's theory was that the evidence should be considered for its relevance under the deliberateness special issue and not for additional mitigating effect. On habeas review, the petitioner argues that the special issues limited the jury's ability to give mitigating effect to the evidence, but it was the defense counsel's theory that imposed the limits on the jury.

---

[12] We do not understand Judge Benavides to disagree with our conclusion that Garcia's pedophilia is not morally mitigating.

[13] Based on these conclusions, the ultimate decision of the state court falls far short of meeting the "objectively unreasonable" requirement for the issuance of a writ of habeas corpus under 28 U.S.C. § 2254(d), regardless of whether the court's reasoning was at times incorrect. We therefore need not discuss the (likely) infirmity of the special "nullification" instruction given the jury or the State's contention that there is no reasonable likelihood, on this record, that the jury unconstitutionally applied the jury instructions. <u>See</u> <u>Boyde v. California</u>, 494 U.S. 370, 380, 110 S. Ct. 1190, 1197-98 (1990).

19

Because the jury was able to give effect to the evidence as presented, there is no <u>Penry</u> violation. Our holding is a narrow one, specific to the facts of this case where defense counsel did not present the evidence for its mitigating effect and instead expressly asked the jury not to sympathize with Garcia. Contrary to the dissent's somewhat hyperbolic suggestions, we do not hold that relevant mitigating evidence should be ignored, nor that a mitigation theory is even required. We do, however, believe we are required to review the case that was actually presented to the jury. We fail to understand how the dissent extrapolates from our holding that defense counsel must argue jury nullification in order to preserve <u>Penry</u> error. We also reject any comparisons to a procedural default claim since the issue is not whether or not Garcia has raised a <u>Penry</u> claim but whether or not the evidence was advanced for its mitigating effect.

In sum, the decisions of the state courts are not vulnerable under AEDPA's demanding tests. The judgment of the district court denying habeas relief is **AFFIRMED.**

BENAVIDES, Circuit Judge, dissenting:

I respectfully dissent from the majority's decision because it mischaracterizes the record and contravenes Supreme Court precedent. Fernando Garcia presented evidence at the sentencing phase of his capital trial that he suffered severe and frequent sexual abuse before the age of ten. Texas law, however, did not permit the jury to give proper effect to this mitigating evidence in deciding between life and death. The majority nonetheless concludes that no Eighth Amendment violation occurred. It reasons that Garcia is now estopped from using the abuse evidence in mitigation because his trial lawyer did not explicitly demand that the jurors disregard Texas law and violate their oaths.

To put the majority's decision in perspective, I offer the following chronology: (1) Texas law did not allow the jury to consider abuse mitigation; (2) Garcia vigorously objected that this was unconstitutional under *Penry* and requested an additional special issue; (3) the trial judge rejected Garcia's objection on the record; (4) Garcia, having preserved his *Penry* objection, attempted (unsuccessfully) to mold his summation to comply with the judge's order and with Texas law; (5) Garcia maintained his *Penry* claim throughout direct and collateral review; (6) Garcia is now precluded from complaining under *Penry*. Before exploring the flaws in the majority's holding, I will explain why Garcia is entitled to relief under a proper *Penry* analysis.

1.  The "Proper Legal Analysis" Under *Penry*

When considering *Penry* claims, "the proper legal analysis . . . is for the court to answer two questions: (1) whether the defendant's evidence held relevance to the jury's capital deliberations; and if so, (2) whether, the jury was able to give constitutionally-sufficient mitigating effect to that evidence." *Tennard v. Dretke*, 442 F.3d 240, 257 (5th Cir. 2006) ("*Tennard III*"). If the Court answers "yes" on the first prong and "no" on the second, then Supreme Court precedent requires habeas relief. *See id.*

a.  Garcia Presented Relevant Mitigating Evidence

The State correctly concedes, "There is no question as to the relevancy of Garcia's mitigating evidence." (Dretke Suppl. Br. 2.)[1] Dr. Powitzky testified that Garcia was repeatedly drugged by his mother at a young age so he would have sex with her and her boyfriend; forced to perform oral sex at the age of five on a friend of his brother's and at six on his brother; forced to perform oral sex at the age of eight on a fourteen-year-old female cousin; and sexually abused in the third grade by a nun who was supposed to be providing him with spiritual guidance. *Penry v. Lynaugh* ("*Penry I*") establishes that evidence of this kind properly

---

[1]    Although Garcia's history of abuse mitigates, I agree with the majority that Garcia's evidence that he suffered from a pedophilic personality disorder does not meet even the low threshold of relevance set by *Tennard II*. In my view, instances of pedophilic abuse that Garcia himself suffered as a victim mitigate independently from his alleged pedophilic personality disorder.

mitigates. *See* 492 U.S. 302 (1989); *see also supra* p. 15 (Maj. Op.) ("[E]vidence that a defendant was a victim of childhood abuse may constitute mitigating evidence . . . ."). The Supreme Court's decision in *Tennard* clarified that general relevance is all that is required. *See Tennard v. Dretke*, 542 U.S. 274, 283-84 (2004) ("*Tennard II*").

### b. The Jury Could Not Give Sufficient Effect to Garcia's Mitigating Evidence of Child Abuse

#### i. The Texas Special Issues Were Inadequate

I now turn to the second prong of the *Tennard III* test. Supreme Court precedent conclusively refutes the State's position that Garcia's evidence of childhood abuse could be given constitutionally-sufficient mitigating effect under the deliberateness and future dangerousness special issues.[2] In *Penry I*, the Court held that the Texas special issues did not permit the jury to give proper mitigating effect to Penry's "abused background." 492 U.S. at 315. "[E]vidence of . . . childhood abuse has relevance to [a defendant's] moral culpability beyond the scope of the [Texas] special issues." *Id.* at 322. This is because

---

[2] The majority incorrectly suggests that Garcia may not have fully asserted an argument in this Court based on his history of abuse. *See Supra* p. 15 (Maj. Op.) (stating that Garcia's abuse argument was limited to a footnote). On the contrary, Garcia made an argument based on his abuse in the main text of at least four different documents submitted to this Court. (Garcia Br. 6-7 & 29 (describing in detail Garcia's history of abuse and arguing that "evidence of . . . his childhood neglect and abuse fell outside the scope of the submitted punishment issues, and therefore required an adequate mechanism—one other than a nullification instruction—in order to permit each juror to give the evidence particularized consideration and effect")); (Garcia Reply Br. 14); (Garcia Suppl. Br. at 9-12); (Garcia Letter-Brief 3).

23

"[p]ersonal culpability is not solely a function of a defendant's capacity to act 'deliberately.'"  *Id.*  A defendant who acts deliberately but who has suffered childhood abuse may be "less morally culpable than defendants who have no such excuse."  *Id.* at 323 (internal quotation marks omitted).  Additionally, a "history of abuse" has only *aggravating* effect as to the second special issue, since "it indicates that there is a probability that he will be dangerous in the future."  *Id*. at 324.[3]

Although Penry presented evidence of diminished mental capacity along with evidence of childhood abuse, the *Penry I* Court treated Penry's history of abuse as something with independent mitigating effect.  *See id.* at 322.  At no point in the opinion does the Court remark that it is only because Penry is mentally retarded that his past history of abuse was not given sufficient mitigating effect under the special issues.  *See Hernandez v. Johnson*, 248 F.3d 344, 377 (5th Cir. 2001) (Dennis, J., dissenting) ("The [Supreme] Court did not hold or suggest that either the factor of mental retardation or childhood abuse by itself would fail to constitute relevant mitigating evidence that the jury must be able to consider and give effect to in deciding Penry's

---

[3]  Therefore, Garcia's history-of-abuse evidence, just like Penry's, forced him to face the "two-edged sword" that worried the Supreme Court.  *See Penry I*, 492 U.S. at 324.

24

fate.").[4]  In *Tennard II*, the High Court discussed Penry's mental retardation and history of abuse claims in wholly independent terms:  "As to the evidence of childhood abuse, we held that the two special issues simply failed to provide a vehicle for the jury to give it mitigating effect."  542 U.S. at 279 (citing *Penry I*) (internal modifications and quotation marks omitted).  In this case, as in *Penry I*, the special issues did not provide a meaningful vehicle for the jury to give effect to Garcia's mitigating evidence of child abuse.

> ii.  The "Nullification Instruction" Did Not Cure the Problem

The "nullification instruction" given in this case did not fix the problem.  Texas courts adopted a nullification instruction in an attempt to correct the special issues' inadequacies identified by the Supreme Court in *Penry I*.  Such an instruction permits the jurors to answer "no" to one of the special issues (even though the proper answer is "yes") if they still believe that the death penalty is not warranted.  In *Penry v. Johnson* ("*Penry II*"), the Supreme Court found this innovation insufficient.  *See* 532 U.S. 782 (2001).

Although the nullification instruction given in Garcia's case differed in some respects from the nullification instruction

---

[4]    The majority in *Hernandez* held that, because the child abuse was "unlinked to the offense, it is not mitigating."  248 F.3d at 349.  Since then, the Supreme Court has explicitly rejected this Circuit's nexus requirement.  *See* *Tennard II*, 542 U.S. at 284.

condemned by *Penry II*, Garcia's instruction still had a primary flaw identified by the Supreme Court: it required jurors to answer a special issue "*dis*honestly in order to give effect to . . . mitigating evidence." *Id.* at 802-03 (emphasis in original); (Dretke Br. 14 n.15 (conceding that the instruction was "substantially similar to the 'nullification instruction' at issue in *Penry II*").[5] Thus, under *Penry II*, the nullification instruction did not bring Garcia's mitigating evidence within the effective reach of the jury.[6]

In sum, Garcia's claim satisfies the second prong of the test that *Tennard III* derived from the Supreme Court's opinion in *Tennard II*. The jury was unable to give constitutionally-sufficient mitigating effect to Garcia's evidence. This should be the end of the matter. This Court, following Supreme Court precedent, has identified the two questions that a proper *Penry* analysis entails. Both favor Garcia. The majority, however, denies relief through a novel theory. This theory was not argued

---

[5]     In this case, as in *Penry II*, the prosecution's closing argument compounded problems with the nullification instruction by emphasizing that the jurors had to answer the special issue questions honestly: "you told us [at voire dire] . . ., 'if you people bring the kind of evidence that convinces me the answer is yes, I'll answer the questions yes.' . . . You told us very clearly and very emphatically that, 'if you people right here bring the kind of case that convinces me that those questions should be answered yes, I'll answer those questions [the two special issues] yes.'" (R. at 23:2902-03.) Then later, "Did he do it deliberately? Yes he did. I'm going to ask you to answer that question yes because the evidence says that answer is yes." *Id.* at 2906.

[6]     Paradoxically, the majority simultaneously acknowledges that nullification instructions are "unconstitutional" yet denies relief in part because "Garcia had the benefit of a nullification instruction." *Supra* p. 19 (Maj. Op.).

26

by the State,[7] has no foundation in the decisions of this Court, and contravenes *Penry II* and *Tennard II*.

## 2. The Majority's Estoppel/Default/Nullification Rationale

The majority here holds that Garcia is somehow estopped from arguing that his mitigating evidence went beyond the special issues because his trial lawyer struggled to shoehorn that evidence within the special issues at summation. *See supra* p. 17 (Maj. Op.). It is worth noting that the majority's creative approach is the fourth separate rationale that has been offered to uphold Garcia's death sentence. The Supreme Court has rejected the first three justifications.[8] The latest approach is to deny Garcia relief because his trial lawyer failed to argue the proper "mitigation theory" before the jury, *supra* p. 11, a "mitigation theory" that Texas law did not even allow the jury to consider at the time.

The majority's refusal to consider Garcia's "new arguments in

---

[7] As discussed above, the State's primary argument on appeal was that Garcia's history-of-abuse evidence "could be fully considered within the special issues." (Dretke Suppl. Br. 2). The majority declines to consider that issue. *Supra* p. 16 (Maj. Op.).

[8] The State defended the sentence on the ground that evidence of child abuse is within the scope of the special issues. (Dretke Br. 36 (arguing that Garcia's jury could give effect to his evidence of sexual abuse through the "deliberately" special issue).) The Supreme Court rejected this rationale in *Penry I*. The Texas Court of Criminal Appeals affirmed Garcia's sentence on the ground that the nullification instruction cured any problem with the special issues. *See Garcia v. State*, 887 S.W.2d 846, 860 (Tex. Crim. App. 1994). The Supreme Court rejected this rationale in *Penry II*. The district court below applied then-controlling Fifth Circuit precedent and upheld Garcia's sentence on the ground that his mitigating evidence was not "constitutionally relevant." *Garcia v. Dretke*, 2003 WL 22144058, *4–5 (N.D. Tex 2003) (unpublished) (holding that Garcia's evidence of "sexual abuse he received as a child" did not give rise to a "uniquely severe permanent handicap"). The Supreme Court rejected this rationale in *Tennard II*.

federal court" because they do not reflect the "case [he] presented in the [state] trial court," *supra* 11, 18 (Maj. Op.), sounds a lot like procedural default. There is a reason why the majority merely gestures in that direction without ever fully going down the procedural-default path. It is because Garcia's lawyer clearly made a *Penry* objection in the Texas trial court. After the court submitted a proposed jury charge, Garcia objected as follows:

> In the Court's Charge on mitigation, which is page 2 of the Court's Charge, we would object for the following reasons:
> . . .
> [W]e would submit, Your Honor, that drug and alcohol abuse and *child abuse* have been brought into evidence. They are universally considered to be mitigating factors. And that the Court does not set those out in applying the law to the facts and relating them to the relevant questions in either Special Issue No. 1 or Special Issue No. 2.
> We would submit, Your Honor, that *a fourth special issue is required*. What I mean by a fourth special issue is an additional special issue besides Special Issues 1 and 2. We would, of course, concede that Special Issue 3 is not raised by the evidence.[9]
> But the fourth special issue, *that has been talked about in* Penry, *is mitigating evidence that is relevant to the blameworthiness and moral culpability of the Defendant in general, yet not directly relevant to either one of the first two special issues*.

(R. at 21:2890–91 (emphasis added).) The trial court denied the objection "with some reluctance." *Id.* at 2895.

---

[9] Under Texas law, a third special issue was sometimes submitted. "'[I]f raised by the evidence,'" the court would submit, "'whether the conduct of the defendant in killing the deceased was unreasonable in response to provocation, if any, by the deceased.'" *Tennard III*, 442 F.3d at 246 n.3 (quoting TEX. CRIM. PROC. CODE Ann. § 37.071(b) (Vernon 1981)).

28

The majority could not rest its analysis on any established version of procedural default because Garcia made a *Penry* objection and maintained it throughout direct and collateral review. *See Beard v. Greene*, 523 U.S. 371, 375 (1998) (defining the procedural default rule: "assertions of error in criminal proceedings must first be raised in state court in order to form the basis for relief in habeas").[10] Whether or not the majority's theory should be understood as a novel extension of procedural default doctrine, that theory is flawed for a number of reasons.

The majority reasons that Garcia should be estopped from making a *Penry* claim because his trial lawyer cabined his closing argument within the deliberateness special issue. The premise of this argument misstates the record. After the trial court denied his explicit *Penry* objection, Garcia's lawyer nonetheless *did* present the jury with a "mitigation theory" that went outside the scope of the special issues. He argued that "the abuse," among other things, "turn[ed] Fernando Garcia from a victim to a predator." *Id.* at 2921. The logic of this argument goes outside the deliberateness special issue. It invited the jury to shift some of the moral responsibility for the crime away from Garcia

---

[10]     Similarly, traditional principles of equitable estoppel do not bar Garcia from pressing his *Penry* claim. In a unanimous decision, the Supreme Court recently confirmed the limitations on that doctrine. Ordinarily, it only applies where a party has "succeeded in persuading a court to accept" a position that is "clearly inconsistent" with the one it now espouses. *See Zedner v. United States*, No. 05.5992, slip op. at 13–15, 547 U.S. __ (June 5, 2006). That has not happened here.

himself to Garcia's abusers, whose conduct was at least partly responsible for turning him into a predator.  Under this "mitigation theory," the jury would attribute some of the blame to Garcia's abusers whether or not Garcia murdered his victim deliberately.  Nor did counsel's vague rhetorical flourish ("I ask for no sympathy for Fernando Garcia") negate this argument.  *Contra supra* p. 16–17 (Maj. Op.).  The jury did not have to conjure feelings of sympathy for Garcia to acknowledge that others shared moral responsibility for the crime and to show Garcia mercy on that basis.

In its rebuttal, the State clearly did not think Garcia's "mitigation theory" had been entirely bound up with whether he acted deliberately.  The State argued that Garcia's "abuse[] as a child" did not excuse his actions because he had the opportunity to participate in rehabilitative counseling but chose not to do so. *Id.* at 2927.  The State essentially contended that Garcia's failure to seek rehabilitation broke the causal chain between Garcia's original abusers and his crime: "His decision, his moral decision, his moral culpability, his life.  *Nobody else's*."  *Id.* at 2928 (emphasis added).  Under the State's theory, despite his history of abuse, Garcia became "solely responsible" for being a "rabid dog" when he "rejected every single attempt to ever make him better." *Id.* at 2934, 2930.  In short, the State argued not only that Garcia

30

acted deliberately but also that Garcia's attempt to shift some of the moral responsibility to his abusers should be rejected.

Thus, the arguments of the defense and prosecution presented the jury with a significant moral controversy. The Texas special issues, however, "provided an inadequate vehicle for the jury to make a reasoned moral response" to the dispute. *Penry II*, 532 U.S. at 800. They did not allow the jury to give effect either to the mitigating evidence Garcia introduced *or* to the "mitigation theory" he presented at summation.

Stepping back from the record in this case, dissecting a defense attorney's closing argument to determine whether it presented a "mitigation theory" that went outside the scope of the special issues is a fundamentally misguided inquiry. To begin with, the search for "the case as presented in the trial court," *supra* p. 18 (Maj. Op.), cannot be limited to ten pages of closing argument in a three-thousand page trial transcript. Good advocates offer their theories of a case not just through summation but also through questioning of witnesses and through the very substance of the evidence they present. *See Taylor v. United States*, 495 U.S. 575, 601 (1990) (stating that courts might discern the Government's "theory or theories of the case presented to the jury" in "the indictment or other charging paper" or in the "actual proof at trial"). It makes no sense to ignore relevant mitigating evidence that the defendant presented to the jury simply because his

31

counsel, at least according to the majority, failed to draw attention to it under an appropriate theory in closing argument. The defendant is not even required to present a summation. Under the majority's theory, however, a defendant's decision to forego summation would invariably forfeit his right to present a *Penry* claim in this Court "because he did not do so before the jury." *Supra* p. 20 (Maj. Op.).

More importantly, requiring the defendant to adopt a "mitigation theory" that goes outside the special issues is paradoxical. As applied, the special issues violate the Eighth Amendment precisely because they limited the defendant's possible mitigation theories. Under Texas law, Garcia could only argue either that he did not commit his crime deliberately or that he was not a danger to society. So that is what he did. The majority has simply confused the cause with the effect. Garcia's lawyer did not restrict the mitigation inquiry; rather, Texas's limited mitigation inquiry under the special issues restricted Garcia's lawyer.

This brings me to a problematic effect of the majority's logic. Texas law did not recognize the mitigation theory the majority claims Garcia should have argued to the jury. Therefore, the majority's theory amounts to a *requirement* that counsel argue jury nullification at closing to preserve *Penry* error. *Compare United States v. Funches,* 135 F.3d 1405, 1409 (11th Cir. 1998) ("[D]efense counsel may not argue jury nullification during closing

32

argument") *and United States v. Thomas*, 116 F.3d 606, 614 (2d Cir. 1997) ("We categorically reject the idea that, in a society committed to the rule of law, jury nullification is desirable or that courts may permit it to occur when it is within their authority to prevent.").[11]

The majority's mandate that defense counsel argue nullification is impossible to square with *Penry II*. The Supreme Court held in *Penry II* that courts cannot require jury nullification of the special issues. The majority now requires that defense counsel insert the same "element of capriciousness" into the sentencing process that the *Penry II* Court found problematic. 532 U.S. at 800. The majority faults Garcia's lawyer for not specifically arguing to the jury that Garcia's life should be spared out of mercy even though doing so, as in *Penry II*, would have been tantamount to demanding that the jurors "answer the special issues dishonestly" and "violate their oath to render a true verdict." *Id.* at 802, 800 (internal quotation marks and emphasis omitted). By shifting the actor who introduces the nullification element from the judge to defense counsel, the majority basically makes an end run around *Penry II*.

---

[11] It is not clear whether the majority acknowledges this problematic aspect of its reasoning: In one part of its opinion, the majority reasons explicitly that defense counsel should have made arguments "beyond the special issues" pursuant to the "nullification instruction" given in this case. *Supra* p. 19 (Maj. Op.). Later in its opinion, it denies that its reasoning requires that "defense counsel must argue jury nullification." *Id*. at 21.

33

In addition, the majority's approach is at odds with at least the spirit of *Tennard II*. In *Tennard II*, the Supreme Court rejected our constitutional relevance inquiry as creating an impermissible "threshold 'screening test'" with "no foundation in the decisions of this Court." 542 U.S. at 283–84. This rebuke overstated somewhat the novelty of our constitutional relevance test. *See Tennard III*, 442 F.3d at 253 n.16. Yet the critique certainly applies here to the majority's innovation.

As with constitutional relevance, the majority uses its estoppel theory as a threshold screening test, refusing to "consider[] whether the jury instructions comported with the Eighth Amendment," *Tennard II*, 542 U.S. at 284, because defense counsel did not explicitly argue outside the special issues at summation. Moreover, the majority's approach has no foundation in Supreme Court precedent. The Court's jurisprudence has invariably looked to "the mitigating evidence presented" rather than to the closing arguments of counsel. *Tennard II*, 542 U.S. at 284 (discussing *Penry I*). Indeed, the majority cannot cite a single authority, Supreme Court or otherwise, in support of its estoppel theory during the eleven pages that it discusses that approach. *Supra* p. 11-19, 20-21 (Maj. Op.). Premises that are fundamental to the majority's analysis, such as that we must focus on the "mitigation theory Garcia *actually made* to the jury," *Id.* at 11 (emphasis in original), are left completely unsupported.

34

As previously stated, the Supreme Court has effectively told us that the only *Penry* inquiries we should undertake are (1) whether the petitioner presented relevant mitigating evidence and (2) whether the jury was able to consider and give sufficient effect to that evidence. Instead of following this mandate, the majority creates another threshold screen.

In conclusion, the trial court failed to present to the jury an adequate vehicle that could give meaningful mitigating effect to Garcia's history of child abuse. Supreme Court precedent establishes that this failure violated his Eight Amendment rights. I would hold that the state court's opposite conclusion was contrary to the Supreme Court's precedent or, alternatively, an unreasonable application of clearly established law. In accord with *Penry I, Penry II*, and *Tennard II*, I would reverse the district court's decision and remand with instructions to grant habeas relief. I respectfully dissent.